**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MANUFACTURERS AND TRADERS** ) | |
| **TRUST COMPANY** ) | |
| ) | **CIVIL ACTION NO. 3:13-174** |
| **Plaintiff,** ) | |
| **v.** ) | **JUDGE KIM R. GIBSON** |
| ) | |
| **MINUTEMAN SPILL RESPONSE,** ) | |
| **INC., B3 MANAGEMENT, L.P.,** ) | |
| **BPK HOLDINGS, LLC, EVEREST** ) | |
| **AVIATION LLC, BPK CAPTIVE,** ) | |
| **INC., DOUBLE B REALTY, and** ) | |
| **MINUTEMAN TOWING, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM AND ORDER OF COURT

### I.    INTRODUCTION

Presently before the Court is (1) an emergency motion for appointment of a receiver (ECF No. 3), filed by Plaintiff Manufacturers and Traders Trust Company ("M&T Bank"), and (2) Defendants' motions in response to Plaintiff's complaint (ECF No. 8), filed by Minuteman Spill Response, Inc., B3 Management, L.P., BPK Holdings, LLC, Everest Aviation, LLC, BPK Captive, Inc., Double B Realty, and Minuteman Towing, Inc. (collectively, "Minuteman").   M&T Bank seeks an accounting and a court-appointed receiver to take control of Minuteman's business operations.   In response, Minuteman requests that this case be transferred to the Middle District of Pennsylvania. Alternatively, Minuteman argues that the complaint must be dismissed for failure to join a necessary party and for failure to state a claim.   For the reasons that follow, the Court will **deny** Minuteman's motions and will further **deny** M&T Bank's motion for a receiver.

## II.     JURISDICTION

The Court exercises diversity jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interests and costs, and the suit is between citizens of different states. M&T Bank is a corporation with its principal place of business at One M&T Plaza, Buffalo, New York. Each of the Defendants has a principal place of business in Pennsylvania. Because the parties disagree on proper venue, the Court will address that issue in more detail below.

## III.     BACKGROUND

This case involves a dispute between a bank lender and its business borrowers. The companies listed in the caption are part of a business enterprise that, among other things, provides services and equipment for the natural gas industry. (ECF No. 14, Hr'g Tr. vol. 1 at 17:8-17). Brian J. Bolus directly or indirectly owns or controls all of the Defendants, including the two operating businesses—Minuteman Spill Response, Inc., and Minuteman Towing, Inc.—and the remaining ancillary entities that hold real property and other assets for the operating businesses. (ECF No. 1, Compl. ¶¶ 3–10; ECF No. 8-1 at 1; ECF No. 14, Hr'g Tr. vol. 1 at 18:6–19:8).

As set forth in the complaint and its exhibits,[1] Minuteman has acquired several loans through M&T Bank that remain outstanding as of September 19, 2013:

---

[1] The complaint includes Exhibits A through Z; these exhibits include lending documents, mortgages, and other finance agreements between Minuteman and M&T Bank.

2

(1) On November 17, 2011, Minuteman Spill Response, Inc. ("Minuteman Spill") executed a Line of Credit Note for $1,500,000 (Compl. Ex. A), along with a Security Agreement granting M&T Bank a first priority security interest in all assets of Minuteman Spill (*see id.* Exs. B, C);

(2) On August 21, 2012, Minuteman Spill executed a Term Note for $440,000, secured by a lien on certain vehicles (*see id.* Ex. D);

(3) On October 17, 2012, Minuteman Spill executed a Term Note for $133,702, secured by a lien on certain vehicles (*see id.* Ex. E);

(4) On June 8, 2012, Minuteman Spill executed a Term Note for $4,600,000, secured by a lien on certain vehicles (*see id.* Ex. F);

(5) On November 17, 2011, B3 Management, L.P. executed a Term Note for $2,952,000, secured by a mortgage on real property located at 2435 Housel Run Road, Milton, Pennsylvania (*see id.* Exs. G, H, I);

(6) On November 14, 2012, B3 Management, L.P. executed a Term Note for $1,500,000; in connection with this Note, Minuteman Spill entered into a Continuing Guaranty and General Security Agreement with M&T Bank ("MSR/B3 Security Agreement"), granting M&T Bank a first priority security interest in all assets of Minuteman Spill (*see id.* Exs. J, K, L, M);

(7) On December 16, 2010, BPK Holdings, LLC executed a Term Note for $873,295.55, secured by three mortgages on real property located at 901 Old Route 15, White Deer, Pennsylvania; 3066 East Valley Road, Loganton,

3

Pennsylvania; and 509 West Third Street, Mifflinville, Pennsylvania (*see id.* Exs. N, O, P, Q, R);[2] and

(8) On April 9, 2009, BPK Holdings, LLC and Minuteman Towing, Inc. executed a Loan Agreement with M&T Bank, wherein M&T Bank agreed to make a $680,000 Mortgage Loan and a $600,000 Term Loan; this agreement was secured by a mortgage on real property located at 401 Richardson Road, Middletown, Pennsylvania (*see id.* Exs. V, W, X).

As of July 30, 2013, Minuteman owed M&T Bank approximately $12,700,000. (Compl. ¶ 33). The total amount owed changes daily.

The dispute in this case began when M&T Bank learned of the Commonwealth of Pennsylvania's ("Commonwealth") pending criminal investigation of Minuteman. On May 29, 2013, the Pennsylvania Office of the Attorney General ("Attorney General") served a warrant on M&T Bank, authorizing the search and seizure of all bank accounts and financial products in possession of M&T Bank relating to Minuteman or to Brian J. Bolus and his family. (Compl. ¶ 34; ECF No. 3 ¶ 4). The Commonwealth also seized most of Minuteman's business assets and records. (Compl. ¶ 35; ECF No. 10 ¶ 7).

Since the seizure, a substantial portion of the Minuteman funds at M&T Bank remain sequestered under court order. (Compl. ¶ 38). M&T Bank avers that, despite repeated requests, Minuteman has refused to provide sufficient financial information from

---

[2] Although BPK Holdings, LLC executed the Term Note, Double B Realty executed the three mortgages in favor of M&T Bank. Double B has since sold the Loganton, Pennsylvania property. M&T Bank executed a partial release of mortgage for the Loganton property on May 17, 2012. (Compl. Ex. S). In connection with the December 16, 2010 Term Note, BPK Holdings, LLC entered into a General Security Agreement with M&T Bank ("BPK Security Agreement"), granting M&T Bank a first priority security interest in all assets of BPK Holdings, LLC. (*Id.* Exs. T, U).

4

which M&T can assess the viability of Minuteman's business operations. (*Id.* ¶ 41). M&T further avers that Minuteman has impeded M&T Bank's efforts to appraise its collateral; that Minuteman has been liquidating assets at "fire sale prices"; and that Minuteman is in "payment default, among other defaults." (*Id.* ¶¶ 37, 41, 43). Given the actions of the Attorney General, "the existing defaults," the lack of "adequate protection of M&T Bank's collateral interests," among other reasons, M&T has filed suit requesting a court-appointed receiver and an accounting. (*Id.* ¶ 43).

Aside from asserting equitable grounds to justify the appointment of a receiver, M&T Bank avers that Minuteman has contractually authorized and consented to a receiver under the pertinent mortgage documents. (*Id.* ¶ 47). According to M&T Bank, the MSR/B3 Security Agreement and the BPK Security Agreement also provide contractual grounds for a receiver. (*Id.* ¶ 49).

M&T Bank filed a complaint on August 8, 2013, and an emergency motion for appointment of a receiver (ECF No. 3) the next day. On September 3, 2013, Minuteman responded to the complaint by filing a motion to transfer venue to the Middle District of Pennsylvania, a motion to dismiss for failure to join a necessary party, and a motion to dismiss for failure to state a claim. (*See* ECF No. 8). These motions have been fully briefed and are ripe for disposition. On September 19, 2013 and October 8, 2013, the Court held a hearing on the motion for appointment of a receiver, where the parties presented extensive evidence and testimony.[3]

---

[3] Due to the urgent nature of M&T Bank's motion for appointment of a receiver, the Court ordered a hearing without first determining the merits of Minuteman's pending motions. The Court will first address the merits of Minuteman's pending motions before considering M&T Bank's motion for a court-appointed receiver.

5

## IV. DEFENDANTS' MOTIONS IN RESPONSE TO THE COMPLAINT

Before addressing the merits of M&T Bank's request for a receiver, the Court must determine whether venue should be transferred to the Middle District of Pennsylvania. The Court must also determine whether M&T Bank's complaint must be dismissed for failure to join a necessary party or for failure to state a claim.

### A. Minuteman's Motion to Transfer Venue

Minuteman seeks to transfer this matter to the Middle District of Pennsylvania under 28 U.S.C. § 1404(a). The issue is not whether venue is proper in this judicial district but whether it is in the "interest of justice" to transfer the matter elsewhere. *See* 28 U.S.C. § 1404(a). Minuteman argues that M&T Bank's principal place of business is in Buffalo, New York, and that M&T Bank has a major office in Harrisburg, Pennsylvania. Minuteman further argues that each of the Defendants has a registered office and headquarters in the Middle District; that all of the mortgaged properties are located in the Middle District; and that a receiver, if appointed, would be dealing with assets located in the Middle District. (ECF No. 8-1 at 9; ECF No. 15-2 at 3–4). On the other hand, M&T Bank argues that venue is proper in the Western District because, under certain loan documents, Minuteman has consented to venue in "any judicial district [in Pennsylvania] where [M&T Bank] has a branch." (ECF No. 13 at 2–3) (citations omitted).

### 1. Legal Standard for Change of Venue

Section 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . ." 28 U.S.C. § 1404. In determining whether

6

to grant a motion to change venue, a district court is ordinarily "vested with wide discretion," *Plum Tree, Inc. v. Stockment*, 488 F.2d 754, 756 (3d Cir. 1973), and must weigh all relevant factors bearing on whether the litigation "would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995). The moving party bears the burden of establishing that a change of venue is warranted, and a plaintiff's "choice of a proper forum is a paramount consideration in any determination of a transfer request." *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970).

In this case, several loan documents between Minuteman and M&T Bank contain the following forum selection clause:

> **BORROWER HEREBY IRREVOCABLY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT IN THE COMMONWEALTH OF PENNSYLVANIA IN A COUNTY OR JUDICIAL DISTRICT WHERE THE BANK MAINTAINS A BRANCH . . . *Borrower acknowledges and agrees that the venue provided above is the most convenient forum for both the Bank and the Borrower. Borrower hereby waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Note.***

(ECF No. 13 at 2) (citations omitted and emphasis in original). As the U.S. Supreme Court recently explained, "[t]he presence of a valid forum-selection clause requires district courts to adjust their usual § 1404(a) analysis . . ." *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*, --- S. Ct. ---, No. 12-929, 2013 WL 6231157, at *11 (U.S. Dec. 3, 2013). It is clear that "[o]nly under extraordinary circumstances" should a district court not enforce a valid forum selection clause. *Id.* Furthermore, in determining the proper forum, a district court should not consider the private interests of the parties:

7

"When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Id.* at *12. Courts may nonetheless consider "public-interest factors," including "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at *11 n.6 (internal citations omitted).

## 2. A Change of Venue is Not Warranted

Transferring this matter to the Middle District does not serve the interests of justice. Minuteman claims that a forum selection clause is just "one relevant factor" that this Court should consider in determining a transfer request. (ECF No. 8-1 at 8). Minuteman also points to certain factors that allegedly weigh in favor of changing venue, including (1) the location of the Minuteman businesses; (2) the location of the mortgaged properties; and (3) the fact that many business dealings between the parties occurred in the Middle District. (*See id.* at 9; ECF No. 15-2 at 3). According to recent Supreme Court jurisprudence, however, all of these considerations are irrelevant.

In this case, M&T Bank chose to file suit in this district, and the parties contractually agreed to venue in any judicial district where M&T Bank has an office, including the Western District of Pennsylvania. Minuteman does not argue that the forum selection agreement was the result of fraud, nor has it shown that enforcing the agreement would violate public policy or seriously inconvenience the parties. *See MoneyGram Payment Sys., Inc. v. Consorcio Oriental, S.A.*, 65 F. App'x 844, 846 (3d Cir. 2003)

8

(citations omitted) (discussing grounds for invalidating a forum selection clause). The fact that Minuteman freely consented to venue in this district—along with the fact that there are no public interest factors weighing in favor of a transfer of venue—leads this Court to conclude that the parties should remain bound by their agreement. The Court will thus **deny** Minuteman's request to change venue.

## B. Minuteman's 12(b)(7) Motion

Minuteman also moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(7) for failure to join a necessary party. Minuteman argues that the Commonwealth is a necessary party based on Federal Rule of Civil Procedure 19(a)(1)(A) because "all actions that would be taken by a potential receiver would have to include the involvement, and possible approval, of the Commonwealth." (ECF No. 15-2 at 5).[4] M&T responds by stating that the Court "clearly can impose an accounting and appoint a receiver for the Defendants, without the joinder of the Commonwealth." (ECF No. 13 at 5).

---

[4] Minuteman also argues that the "Princess Lida doctrine" precludes the Court from exercising control over property that is now under the Commonwealth of Pennsylvania's control. (ECF No. 15-2 at 6). Minuteman raises this argument for the first time in its reply brief. Although it is improper to introduce new legal arguments in a reply brief, *see Karlo v. Pittsburgh Glass Works, LLC*, 880 F. Supp. 2d 629, 641 (W.D. Pa. 2012), the Court will briefly address the argument. The Princess Lida doctrine "applies when: (1) the litigation in both the first and second fora are *in rem* or *quasi in rem* in nature, and (2) the relief sought requires that the second court exercise control over the property in dispute and such property is already under the control of the first court." *Dailey v. Nat'l Hockey League*, 987 F.2d 172, 176 (3d Cir. 1993) (citing *Princess Lida v. Thompson*, 305 U.S. at 466 (1939)). Defendants—along with Brian J. Bolus as an individual—are subject to a pending *criminal* investigation in Pennsylvania. Because these proceedings are not *in rem* or *quasi in rem* in nature, the doctrine is inapplicable.

9

### 1. Legal Standard for Failure to Join a Necessary Party

In reviewing a Rule 12(b)(7) motion to dismiss, a district court "must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party." *Pittsburgh Logistics Sys., Inc. v. C.R. England, Inc.*, 669 F. Supp. 2d 613, 618 (W.D. Pa. 2009) (citing *Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*, 65 F. App'x 803, 805 (3d Cir. 2003)). Evidence outside the pleadings may be considered. *See Cummings v. Allstate Ins. Co.*, CIV.A. 11-02691, 2011 WL 6779321, at *3 (E.D. Pa. Dec. 27, 2011) (citations omitted).

To prevail on a Rule 12(b)(7) motion, the movant must show that the plaintiff has failed to join a party under Federal Rule of Civil Procedure 19. *See Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312 (3d Cir. 2007). Rule 19 states in material part:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party if (A) *in that person's absence, the court cannot accord complete relief among existing parties*; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) . . . impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring . . . inconsistent obligations . . .

Fed. R. Civ. P. 19(a)(1) (emphasis added). Although a party may be deemed necessary under clause (A) or clause (B) of Rule 19(a)(1), *Gen. Refractories Co.*, 500 F.3d at 312, Minuteman solely argues that the Commonwealth must be joined as a party under clause (A). (ECF No. 8-1 at 11; ECF No. 15-2 at 5).

Under clause (A) of Rule 19(a)(1), a district court must determine whether it "can grant complete relief to persons *already named* as parties to the action; what effect a decision may have on absent parties is immaterial." *Gen. Refractories Co.*, 500 F.3d at

313 (emphasis in original) (citing *Angst v. Royal Maccabees Life Ins. Co.*, 77 F.3d 701, 705 (3d Cir. 1996).[5] Complete relief can be granted as long as the "relief actually afforded to the parties in the action is meaningful." *Bank of Am. Nat'l Trust & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 844 F.2d 1050, 1054 n.5 (3d Cir. 1988). If a party is deemed necessary under Rule 19(a)(1), that party must be joined if feasible. *Pittsburgh Logistics Sys., Inc.*, 669 F. Supp. 2d at 617. Otherwise, if the party is not deemed necessary under Rule 19(a)(1), the district court's analysis is finished. *See id.* at 617.

## 2. The Commonwealth is not a Necessary Party

The Court's inquiry is whether it can accord meaningful relief to the parties absent joinder of the Commonwealth. The Court answers this question in the affirmative because the Commonwealth is not necessary in resolving the instant dispute. As Minuteman points out, a court-appointed receiver would face unusual challenges because the Commonwealth has seized most of Minuteman's financial accounts. Nevertheless, the Court can order an accounting without the Commonwealth's involvement. The Court can likewise appoint a receiver, even if that receiver would face unusual constraints provided by the Commonwealth. At minimum, then, the Court can accord meaningful relief to the parties.

Minuteman argues that the Commonwealth is a necessary party under Rule 19(a)(1)(A) because a receiver could not act without the Commonwealth's approval. (ECF No. 15-2 at 5). Minuteman further argues, "[N]either [M&T] Bank, nor any receiver that

---

[5] *General Refractories* refers to Rule 19(a)(1). Rule 19 has since been amended, and the applicable section is Rule 19(a)(1)(A). The language of the rule has not substantially changed. "The language of Rule 19 has been amended as part of the general restyling of the Civil Rules to make them more easily understood . . . . [t]hese changes are intended to be stylistic only." Fed. R. Civ. P. 19 advisory committee's note (discussing the 2007 amendments).

11

might be appointed, can operate without being substantially affected by the actions of the Commonwealth." (ECF No. 8-1 at 12). Finally, Minuteman asserts, "[T]he sweepingly broad powers that [M&T] Bank requests the receiver be granted would run counter to the [Commonwealth's] interests." (*Id.*). These arguments are unpersuasive because they have no bearing on the Court's present inquiry. The Court can appoint a receiver without the Commonwealth being joined as a party, and the fact that the Attorney General has already consented to the proposed order appointing a receiver corroborates this finding. (*See* ECF No. 11-1). The Court will therefore **deny** Minuteman's 12(b)(7) motion.

### C. Minuteman's 12(b)(6) Motion

Minuteman next asserts that M&T Bank's complaint must be dismissed for failure to state a claim. First, Minuteman argues that the Court cannot appoint a receiver because a receiver is the sole remedy requested. (ECF No. 8-1 at 17). Second, Minuteman argues that M&T Bank has failed to plead facts showing irreparable harm. (*Id.*). Third, Minuteman argues that M&T Bank has failed to plead facts showing "wrongdoing, fraud, waste, mismanagement or dissipation" of assets. (*Id.*). The Court will first provide the relevant legal standards before addressing each of these arguments.

### 1. Legal Standard for a Rule 12(b)(6) Motion

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Federal Rule of Civil Procedure 12(b)(6) allows a party to seek dismissal of a complaint or portion of a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Although the federal pleading standard has been "in the

12

forefront of jurisprudence in recent years," *Fowler v. UPMC Shadyside*, 578 F.3d 203, 209 (3d Cir. 2009), the standard of review under Rule 12(b)(6) is now familiar.

In determining the sufficiency of the complaint under Rule 12(b)(6), a district court must conduct a two-part analysis. First, the court must separate the factual matters averred from the legal conclusions asserted. *See Fowler*, 578 F.3d at 210. Second, the court must determine whether the factual matters averred are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The complaint need not include "detailed factual allegations." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Moreover, the court must construe the alleged facts, and draw all inferences gleaned therefrom, in the light most favorable to the non-moving party. *See id.* at 228. Nevertheless, "[t]hreadbare recitals of the elements of a cause of action" do not suffice. *Iqbal*, 556 U.S. at 678. Rather, a complaint must present sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 263 n.27 (3d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678). In other words, the plaintiff must allege facts that could, if established at trial, entitle her to relief. *See Fowler*, 578 F.3d at 213.

### 2.    Legal Standard for Appointment of a Receiver

The parties disagree as to whether Pennsylvania or federal law applies to the decision to appoint a receiver. Neither party, however, has argued that any material difference might arise if the Court applies federal or Pennsylvania law. (*See* ECF Nos. 8, 13, 15-2, 22, 24, 26). In federal diversity cases, "[i]f the matter is procedural, and an

13

applicable federal statute, rule, or policy exists, then federal procedural law applies; if the matter is substantive, the court must apply the substantive law of the forum state." *Chin v. Chrysler LLC*, 538 F.3d 272, 278 (3d Cir. 2008). Federal Rule of Civil Procedure 66 addresses receivers in federal court:

> These rules govern an action in which the appointment of a receiver is sought or a receiver sues or is sued. But the practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule. . . .

Fed. R. Civ. P. 66. The Court will thus apply federal law in this matter, although the decision to appoint a receiver rests within the sound discretion of the trial court regardless of whether Pennsylvania or federal law applies. *See Comerica Bank v. State Petroleum Distributors, Inc.*, 3:08-CV-678, 2008 WL 2550553, at *3 (M.D. Pa. June 2, 2008).

A receivership is an extraordinary remedy that is justified in extreme situations. *See, e.g., Mintzer v. Arthur L. Wright & Co.*, 263 F.2d 823, 824 (3d Cir. 1959) (describing a court-appointed receiver as "an equitable remedy of rather drastic nature"). Because a receiver "unquestionably interfere[s]" with an individual's right to otherwise control his or her property, *see Mintzer*, 263 F.2d at 825, a district court should appoint a receiver only "in cases of necessity, and when the plaintiff clearly and satisfactorily shows that an emergency exists and the receiver is needed to protect the property interests of the plaintiff." *Comerica Bank*, 2008 WL 2550553 at *4; *accord Miller v. Fisco, Inc.*, 376 F. Supp. 468, 470 (E.D. Pa. 1974).

Pertinent case law indicates that various extraordinary circumstances can justify a court-appointed receiver. Although there is no precise formula for determining whether a

14

receiver should be appointed, a federal district court may consider the following equitable

factors:

(1) the probability of the plaintiff's success in the action;
(2) the possibility of irreparable injury to the plaintiff's interests in the property;
(3) the inadequacy of the security to satisfy the debt;
(4) the probability that fraudulent conduct has occurred or will occur to frustrate the plaintiff's claim;
(5) the financial position of the debtor;
(6) the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered;
(7) the inadequacy of available legal remedies;
(8) the lack of a less drastic equitable remedy; and
(9) the likelihood that appointing a receiver will do more harm than good.

*Comerica Bank*, 2008 WL 2550553 at \*4 (citations omitted); *accord Rumbaugh v. Beck*,

491 F. Supp. 511, 520 (E.D. Pa. 1980), *aff'd*, 636 F.2d 1210 (3d Cir. 1980).[6] The Court

will consider these factors in determining whether M&T Bank has asserted an actionable

claim.

---

[6] Courts in the Third Circuit have considered various standards in determining the merits of a request for a court-appointed receiver. A receiver may be warranted, e.g., (1) "to prevent threatened diversion or loss of assets through gross fraud and mismanagement" of corporate officers, *Miller v. Fisco, Inc.*, 376 F. Supp. 468, 471 (E.D. Pa. 1974) (citations omitted); (2) to "avert further loss of assets through waste," *Tanzer v. Huffines*, 408 F.2d 42, 43 (3d Cir. 1969); or (3) to protect corporate property that is in "grave and imminent danger of dissipation," *Zinke-Smith, Inc. v. Marlowe*, 323 F. Supp. 1151 (D.V.I. 1971) (citations omitted). The predominant theme for appointing a receiver under Pennsylvania law is that a receiver should be appointed in cases of "obvious waste, dissipation, fraud or mismanagement." *Simms v. Exeter Architectural Products, Inc.*, 868 F. Supp. 668, 672 (M.D. Pa. 1994) (citing *Hankin v. Hankin*, 493 A.2d 675 (1985)). Given that the parties dispute whether federal or Pennsylvania law applies, and there is no clearly established legal standard for the appointment of a receiver in this Circuit, the Court will analyze whether a receiver is justified using the equitable factors discussed in *Comerica Bank*. These factors sufficiently address both Pennsylvania and federal law, and they provide an encompassing view of the circumstances that may justify the extraordinary remedy of a receiver.

### 3. The Complaint Plausibly Establishes a Claim for Relief

M&T Bank has pled sufficient facts showing a "plausible claim for relief." *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). After construing the alleged facts and drawing all reasonable inferences in favor of M&T Bank, the Court finds that there are sufficiently pleaded facts to show that equity plausibly favors a receiver in this case.

### i. Equitable Principles

M&T Bank avers that the Commonwealth has seized the assets and financial accounts of Minuteman, causing severe harm to the business operations. (Compl. ¶¶ 34–36). M&T Bank further avers:

(1) Minuteman is in default on various loans totaling nearly $12,700,000;

(2) Minuteman lacks adequate capital to fund its operations;

(3) Minuteman has failed to cooperate with M&T Bank's efforts to verify and appraise its collateral;

(4) M&T Bank has no way of ensuring the continuing viability of the Minuteman operations; and

(5) Minuteman has been encumbering or transferring M&T Bank collateral.

(*See id.* ¶¶ 41–43). These averments show that there is a reasonable possibility of imminent danger to M&T Bank's collateral, inadequate security to satisfy Minuteman's debt, and wrongful conduct that could frustrate M&T Bank's efforts to secure its collateral. The alleged facts in the complaint do not overwhelmingly support a receiver in this matter, but the complaint is nonetheless sufficient to withstand a Rule 12(b)(6) challenge.

16

M&T Bank also raises contractual grounds for a receiver. (Compl. ¶¶ 48–49). Minuteman does not address these contractual provisions in its motion to dismiss. Given that the complaint alleges sufficient facts to plausibly justify a court-appointed receiver on equitable grounds, the Court need not address these contractual provisions at this time.

## ii.    Minuteman's Rule 12(b)(6) Arguments are Without Merit

Minuteman argues that the Court cannot appoint a receiver absent some "recognized presently existing right" and that a receiver cannot be the "sole remedy" that M&T Bank requests. (ECF No. 8-1 at 17). Minuteman incorrectly cites Pennsylvania law for this proposition. Moreover, M&T Bank holds a presently recognized right as a first priority secured creditor in all assets of Minuteman Spill. *See Mintzer v. Arthur L. Wright & Co.*, 263 F.2d 823, 825 (3d Cir. 1959) (finding that, to hold a recognized right, a creditor must possess a right in the debtor's property, not a "mere claim against the debtor").[7]

Minuteman raises an interesting argument as to whether this Court can appoint a receiver when M&T Bank requests no other immediate relief other than a receiver and an incidental accounting. "A receivership is only a means to reach some legitimate end sought through the exercise of the power of a court of equity. It is not an end in itself." *Gordon v. Washington*, 295 U.S. 30, 37 (1935). Thus, a federal court sitting in equity cannot appoint a receiver "where the appointment is not ancillary to some form of final relief." *Id.* at 38. The classic example in which a receiver is incidental to a form of final relief is when a court appoints a receiver to manage mortgaged property for its protection and conservation pending a foreclosure. *Id.* at 37.

---

[7] See *supra* Part III for a discussion on the loan agreements under which M&T Bank and Minuteman have explicitly agreed that M&T Bank is a first priority secured creditor.

17

Here, M&T Bank asks not simply that a receiver be appointed to manage the business assets and operations but that a receiver "determine the best method of satisfying the obligations owed to M&T Bank, including, but not limited to, liquidating assets." (Compl. at 18). Although a party may not bring a "naked action for a receiver in the absence of some path to further, final relief," a federal court's equitable power to appoint a receiver extends to such situations where "an explicitly stated and contemplated end of the receivership is the sale of the properties." *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d 247, 257 (S.D.N.Y. 2012). M&T Bank seeks a receiver to protect and conserve its collateral after Minuteman defaulted on loans. Because M&T's complaint explicitly contemplates liquidation of Minuteman assets, the Court finds that it can assert its equitable powers to appoint a receiver absent any other relief immediately sought.

Minuteman next argues that M&T Bank has failed to plead any facts showing irreparable harm. (ECF No. 8-1 at 17).[8] Minuteman accurately notes that the possibility of economic loss alone does not constitute irreparable harm. *See Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994). The possibility of irreparable harm, however, is just one factor that this Court should consider in determining whether to appoint a receiver. Indeed, the possibility of irreparable harm deserves substantial consideration because a plaintiff must make a clear showing that (1) an emergency exists and (2) that a receiver is

---

[8] Minuteman cites *Rumbaugh v. Beck* as follows: "It is well settled that monetary loss alone does not constitute the kind of injury essential to the granting of a receivership." (ECF No. 8-1 at 18). Minuteman misquotes this case. The correct quotation follows: "It is a well-established principle that monetary loss alone does not constitute that kind of injury essential to the granting of a *preliminary injunction*." *Rumbaugh v. Beck*, 491 F. Supp. 511, 517 (E.D. Pa. 1980), *aff'd*, 636 F.2d 1210 (3d Cir. 1980) (emphasis added). The *Rumbaugh* Court did not find—nor has any other court in this Circuit held—that the same legal standards apply for a preliminary injunction and a court-appointed receiver.

18

necessary to protect the property interests of the plaintiff. *See Rumbaugh v. Beck*, 491 F. Supp. 511, 520 (E.D. Pa. 1980), *aff'd*, 636 F.2d 1210 (3d Cir. 1980); *Comerica Bank*, 2008 WL 2550553 at \*4; *Miller v. Fisco, Inc.*, 376 F. Supp. 468, 470 (E.D. Pa. 1974). As previously noted, M&T Bank has sustained its burden to withstand a Rule 12(b)(6) challenge. M&T Bank has pleaded sufficient facts to show that the appointment of a receiver is plausibly justified on equitable grounds. It is also reasonable that an emergency exists because, when taking the averments as true, Minuteman is (1) liquidating assets at "fire sale prices," (2) transferring encumbered assets without M&T Bank's approval, and (3) impeding M&T Bank's efforts to appraise and verify its collateral. (Compl. ¶¶ 41–43).

Finally, Minuteman argues that M&T Bank has failed to plead sufficient facts showing wrongdoing, fraud, waste, mismanagement, or dissipation of assets. (ECF No. 8-1 at 17). Minuteman incorrectly cites Pennsylvania law to support this argument, and, although these factors are relevant considerations, there are other relevant factors at issue. As well, the averments in the complaint do suggest the possibility of either wrongdoing or gross mismanagement by corporate officers. The fact that the Attorney General executed a warrant to seize Minuteman's financial accounts also substantiates this view. After construing the alleged facts and drawing all reasonable inferences in favor of M&T Bank, the Court finds that M&T Bank has pleaded sufficient facts to justify a court-appointed receiver. The Court will **deny** Minuteman's Rule 12(b)(6) motion.

## V. PLAINTIFF'S MOTION FOR APPOINTMENT OF A RECEIVER

The Court will now address the merits of M&T Bank's motion for a court-appointed receiver (ECF No. 3). As previously noted, on September 19, 2013 and October 8, 2013, the Court held a hearing on this motion. Below is an overview of the arguments and the Court's findings of fact and conclusions of law.[9]

### A.    Overview of Arguments

M&T Bank argues that equity demands the immediate appointment of a receiver. In support of this argument, M&T Bank claims that

(1) The Commonwealth's seizure of Minuteman assets has severely harmed the Minuteman operations, resulting in continued operating losses (ECF No. 25 ¶ 140; ECF No. 26 at 4);

(2) Minuteman has failed to "properly react and manage their cash crisis," resulting in the loss of "key employees" and "material customers" (ECF No. 25 ¶ 140);

(3) Minuteman has made material misrepresentations to M&T Bank by opening financial accounts at another bank, without M&T Bank's knowledge and in violation of the loan documents (ECF No. 16-2 ¶ 6);

---

[9] At the hearing, the Court admitted into evidence Plaintiff's Exhibit List, Volumes 1 and 2, and Plaintiff's Supplemental Exhibit List; these volumes contain Exhibits 1 through 42. Plaintiff's Exhibit Number 2 contains the complaint and the various loan documents attached as Exhibits A through Z. The Court also admitted into evidence Defendants' Exhibits A through E. These Exhibits will be cited as Pl. Ex. [#] and Defs. Ex. [letter]. The loan documents will be cited as Pl. Ex. 2[letter]. A transcript of the proceedings can be found at ECF Numbers 14 and 20, which will be cited as Hr'g Tr. vol. 1 and Hr'g Tr. vol. 2, respectively.

(4) Minuteman has liquidated assets outside the "ordinary course of business" that has led to the "inevitable and continuing diminution in [M&T Bank's] collateral value" (ECF No. 26 at 4; *accord* ECF No. 25 ¶ 140);

(5) Minuteman has defaulted under the loan documents (ECF No. 25 ¶ 140; ECF No. 26 at 4); and

(6) Minuteman has refused to cooperate with M&T Bank's efforts to appraise its collateral and has failed to provide M&T Bank with any business plan or budget (ECF No. 26 at 4).

Additionally, M&T Bank asserts contractual grounds for a receiver. Under certain loan documents, Minuteman has allegedly "consented to and acknowledged M&T Bank's right to have a receiver appointed" upon default. (ECF No. 25 ¶¶ 141, 150).

In response, Minuteman argues that a court-appointed receiver is not justified because there is no existing emergency. (*See* ECF Nos. 10, 24). Minuteman contends that only non-essential assets have been liquidated to satisfy outstanding debt obligations and that Minuteman is now current on payments to M&T Bank. (ECF No. 10 at 3, 7, 10; ECF No. 24 at 5). Minuteman also argues that M&T Bank has failed to show irreparable harm, inadequate remedies at law, or any decreased value in Minuteman's substantial real estate holdings. (ECF No. 24 at 3–5). Finally, Minuteman argues that there is no evidence of fraud, waste, or the diversion of assets in this case, and that a court-appointed receiver would merely exacerbate Minuteman's existing problems. (*Id.* at 6, 12).

21

## B. Findings of Fact

The Court makes findings of fact with regard to the following: (1) the seizure of Minuteman's assets, (2) key events occurring shortly after the seizure, (3) Minuteman's alleged misrepresentations to M&T Bank, (4) the helicopter sale, (5) the status of Minuteman's loans and business operations, (6) the current value of M&T Bank's collateral, and (7) the proposed receiver.[10]

### The Commonwealth's Seizure

1. On May 29, 2013, the Attorney General served a warrant on M&T Bank, which authorized the search and seizure of "[a]ny and all contents or proceeds of all accounts" and "[a]ny and all financial products" relating to Minuteman, Brian Bolus, Karen Bolus, and the Bolus children. (Pl. Exs. 1, 6).

2. Following service of the warrant, M&T Bank froze Minuteman's financial accounts, thereby depriving Minuteman of access to capital that is necessary to conduct business operations. (Pl. Ex. 6).

3. The Attorney General seized about 450 boxes of documents from Minuteman, including "virtually all business records, financial records, titles to vehicles, notes, customer files, receivable files, [and] payables." (Hr'g Tr. vol. 2 at 150:21-24).

---

[10] M&T Bank suggests that this Court draw an adverse inference from the fact that, at the hearing, Brian J. Bolus invoked his Fifth Amendment right against self-incrimination. M&T Bank makes no specific suggestion as to what type of adverse inference this Court should draw and instead argues that Bolus's refusal to testify "further amplifies the need for the appointment of a receiver." (ECF No. 26 at 9). There are no facts from which to draw an adverse inference in this matter. The Court bases its factual findings entirely on the evidence presented at the hearing.

22

Minuteman no longer had access to bills, invoices, or schedules for inspections and registration of motor vehicles. (*Id.* at 151:17-22).

4. As of October 8, 2013, the Attorney General had returned approximately 100 boxes of documents to Minuteman. (*Id.* at 152:7-12).

5. Notwithstanding the pending criminal investigation and execution of the warrant, Minuteman has continuously maintained access to the equipment and vehicles necessary to conduct its business operations. (*See id.* at 184:16-21).

## Key Events after the Seizure

6. On May 30, 2013—the day after the Commonwealth's seizure—M&T Bank transferred Minuteman's loans to its Special Assets Department. (Pl. Ex. 34 at 2). Keith Mangan is a senior loan workout officer at M&T Bank who manages "highly risk rated" commercial loans. (Hr'g Tr. vol. 1 at 25:15-22). Mangan currently manages all of the Minuteman loans at M&T Bank. (*Id.* at 27:4-10).

7. On June 5, 2013, the Supervising Judge of the 34th Statewide Investigating Grand Jury ("Supervising Judge") authorized the release of $225,000 from an M&T Bank account to Minuteman. (Pl. Ex. 8). Minuteman had informed the Supervising Judge that these funds were "necessary for the payment of employees' wages and for the business expenses necessary to continue business operations." (*Id.*).

8. On or about June 7, 2013, the Supervising Judge issued an order directing M&T Bank to sequester $340,518.62 from Minuteman's operating account at M&T Bank. (Pl. Ex. 9; Hr'g Tr. vol. 2 at 153:20–154:12). M&T Bank transferred these funds into a "noninterest-bearing suspense account." (Hr'g Tr. vol. 1 at 45:18-24).

23

9. The June 7, 2013 order further directed M&T Bank to provide Minuteman immediate access to its operating, payroll, and insurance reimbursement accounts. (Pl. Ex. 9). Minuteman Spill received authorization to "conduct its business activities in the ordinary course of business, including, without limitation, making all loan payments to M&T Bank." (*Id.*).

10. In summary, by June 7, 2013, Minuteman had access to $225,000 in its operating account; $340,518.62 remained sequestered in a separate suspense account; and Minuteman could now make deposits, transfers, and withdrawals to and among the three unfrozen accounts. (Pl. Ex. 9; Hr'g Tr. vol. 1 at 45:14–46:24; Hr'g Tr. vol. 2 at 153:8-13). All other Minuteman accounts at M&T Bank remained frozen. (Hr'g Tr. vol. 1 at 46:24).

11. On June 12, 2013, M&T Bank sent Minuteman a Notice of Default. (Pl. Ex. 10). The notice stated that Minuteman had "failed to make certain payments due with respect to [four different loans]." (*Id.* at 3). The notice also stated that the warrant served on M&T Bank constituted a default under the loan documents. (*Id.* at 3–4).

## Alleged Misrepresentations to M&T Bank

12. On June 6, 2013, Minuteman opened three bank accounts at Centric Bank. (Hr'g Tr. vol. 2 at 29:21–32:5; Pl. Exs. 37, 38, 39).

13. The accounts opened at Centric Bank had the same names as the unfrozen M&T Bank accounts: operating account, payroll account, and insurance reimbursement account. (Hr'g Tr. vol. 2 at 32:3-5; Pl. Ex. 37).

24

14. Minuteman never deposited funds into the payroll account or the insurance reimbursement account at Centric Bank; as of July 2013, these accounts were no longer open. (Pl. Ex. 37).

15. The pertinent loan documents require Minuteman to maintain "primary accounts" at M&T Bank. (Pl. Ex. 3 at § 6.01(n); Pl. Ex. 2B at ¶ 3.5; Pl. Ex. 2H at § 3(d); Pl. Ex. 2K at § 3(d); Pl. Ex. 2O at § 3(d); Pl. Ex. 2V at § 4.6).

16. On June 6, 2013, Minuteman deposited $106,798.87 into the Centric Bank operating account. (Pl. Exs. 38, 39). The account balance has fluctuated since that time; as of September 30, 2013, the balance was $371,452.41. (Pl. Ex. 38).

17. During August and September 2013, Minuteman deposited over $1.2 million into the Centric Bank operating account and over $600,000 into the M&T Bank operating account. (Pl. Ex. 41).

18. According to M&T Bank, Minuteman never disclosed the existence of the Centric Bank accounts. (Hr'g Tr. vol. 2 at 34:12-15, 51:14). M&T Bank suggests that there is no "good faith reason" for Minuteman to open or to use these accounts. (*Id.* at 51:14, 53:3).

19. M&T Bank received a $144,731.88 check drawn on the Centric Bank operating account on August 15, 2013. (Pl. Ex. 38, Check No. 4142). Minuteman has issued at least five checks to M&T Bank drawn on the Centric Bank operating account. (Pl. Ex. 38, Check Nos. 4139, 4140, 4141, 4142, 4147).

20. M&T Bank suggests that Minuteman filed a motion with the Supervising Judge containing false or materially misleading information. (ECF No. 25 ¶ 79). On July 17, 2013, Minuteman filed a Motion for Release of Assets stating in material part:

25

4.    [The Attorney General] searched, <u>inter alia</u>, MSR M&T accounts . . . as well as the personal account of Brian and Karen Bolus, the custodial account which Mr. and Mrs. Bolus maintained for their son, Preston, and Mr. Bolus's retirement account.

6.    M&T Bank was the sole depository of the business accounts for MES [Minuteman Environmental Services] and MSR [Minuteman Spill Response], and the personal accounts of the Bolus family.

(Pl. Ex. 16 ¶¶ 4, 6).

21. Minuteman maintained all of its financial accounts at M&T Bank as of the seizure on May 29, 2013. The fact that Minuteman opened accounts at Centric Bank after the seizure does not make the statements in the Motion for Release of Assets (Pl. Ex. 16) materially misleading given that Minuteman had been referring to the initial search and seizure of accounts.

22. Although Minuteman did not comply with the terms of the loan documents by opening accounts at Centric Bank, M&T Bank presented no evidence of fraud on the part of Minuteman. Given the uncertainty associated with the accounts at M&T Bank—along with the strained relationship between Minuteman and M&T Bank— there are non-fraudulent reasons why Minuteman would open the accounts at Centric Bank. Minuteman also made several payments to M&T Bank using funds drawn on the Centric Bank operating account, showing that Minuteman was not actively concealing assets in those accounts.

## Helicopter Sale

23. Minuteman had purchased a helicopter in March 2012 for $2,910,600. (Pl. Ex. 2Y; Hr'g Tr. vol. 1 at 144:10-11).

24. On August 6, 2013, the Supervising Judge issued an order that, among other things, permitted Minuteman to sell the helicopter. (Pl. Ex. 17). Minuteman was directed to pay the "worker's compensation debt of approximately $270,000," with the remaining proceeds to be applied "to the debt at M&T Bank as worked out between Brian Bolus and the bank." (*Id.*).

25. On August 20, 2013, Minuteman entered into a Purchase Agreement with SPC 2008 LLC for the sale of the helicopter. (Pl. Ex. 18). The gross purchase price was $2,800,000. (*Id.*).

26. The helicopter sale closed on or about August 30, 2013. (Pl. Ex. 22.). Minuteman paid the Aircraft Lease balance of $2,166,166.52 to M&T Bank, leaving $587,862.07 in net proceeds; $270,811.00 of the proceeds then went to the worker's compensation insurance carrier. (*Id.*).

27. M&T Bank and Minuteman have been unable to agree on how the remaining net proceeds of $317,051.07 should be applied to the debts at issue. (Def. Ex. C). M&T Bank holds these proceeds in a separate account. (Hr'g Tr. vol. 1 at 129:23–130:6; Pl. Ex. 22).

28. At the hearing, Keith Mangan, speaking on behalf of M&T Bank, acknowledged that a sales price of $2,800,000 for the helicopter was not a "fire sale price." (Hr'g Tr. vol. 1 at 144:19).

## Status of the Loans and Business Operations

29. As of June 12, 2013, M&T Bank has been entitled to exercise its rights and remedies under the loan documents, including foreclosure. (Pl. Ex. 10; Hr'g Tr. vol. 1 at 9:12-19).

30. Since July 30, 2013—the date in which M&T Bank filed the complaint in this case—Minuteman has decreased its debt to M&T Bank by more than 20 percent (about $2.5 million).[11] Below is a summary of the outstanding principal balance of the Minuteman loans, as calculated by M&T Bank on September 18, 2013:

| **Borrower** | **Loan** | **Monthly Repayment** | **Payment Status** | **Principal Balance** |
|---|---|---|---|---|
| Minuteman Spill Response | Line of Credit #34 | interest only | Due for 9/23/2013 | $1,145,000.00 |
| Minuteman Spill Response | **Term Loan #190** | $76,666.67 | **Past Due (8/8/2013)** | $3,602,309.40 |
| Minuteman Spill Response | Term Loan #208 | $7,333.33 | Due for 9/23/2013 | $352,000.34 |
| Minuteman Spill Response | Term Loan #216 | $2,228.37 | Due for 10/17/2013 | $109,189.93 |
| B3 Management | Mortgage #18 | $12,300.00 | Due for 10/19/2013 | $2,681,400.00 |
| B3 Management | Term Loan #26 | $12,557.30 | Due for 10/14/2013 | $1,169,648.97 |
| BPK Holdings | Mortgage #545125 | $3,641.14 | Due for 10/01/2013 | $363,737.78 |
| BPK Holdings | Term Loan #545137 | $4,851.64 | Due for 10/18/2013 | $713,191.43 |
| **Total** | | | | **$10,136,477.85** |

(Pl. Ex. 30) (modifications to original).

---

[11] As of July 30, 2013, Minuteman owed M&T Bank $12,695,425.73. (Compl. ¶ 33). Minuteman owed $10,136,477.85 as of September 18, 2013.

31. As of September 9, 2013, the amount past due on Term Loan 190, including late charges, was $83,993.73; the total amount due on Term Loan 190, including payments past due and late charges, was $171,579.46. (Def. Ex. A).

32. M&T Bank holds $317,051.07 in proceeds from the helicopter sale, which M&T Bank has not applied to any of the Minuteman loans. (Hr'g Tr. vol. 1 at 129:23–130:6; Pl. Ex. 22; Def. Ex. C). On September 6, 2013, Minuteman requested that M&T Bank apply $179,579.46 of these proceeds to Term Loan 190. (Def. Ex. A).

33. On September 27, 2013, M&T Bank issued a demand on Line of Credit #34. (Hr'g Tr. vol. 2 at 50:15-16; Pl. Ex. 42). The amount owed was $1,145,445.28, with interest and other charges accruing daily. (Pl. Ex. 42).

34. As of October 8, 2013, Minuteman had not paid the amount due on Line of Credit #34. (Hr'g Tr. vol. 2 at 50:24-25).

35. Minuteman has a workforce of less than 60 employees, reduced from 140 or 150 employees as of May 29, 2013. (Hr'g Tr. vol. 2. at 201:3-9).

36. Minuteman seeks to sell "un-needed M&T encumbered assets" that are valued at approximately $2 million; liquidating these assets would reduce Minuteman's monthly debt obligations to M&T Bank by roughly $42,000. (Hr'g Tr. vol. 2 at 201:11-13; Def. Ex. E).

### Current Value of M&T Bank's Collateral

37. M&T Bank suggests that Minuteman has refused to permit Ritchie Brothers to appraise M&T Bank's "non-real estate collateral." (Hr'g Tr. vol. 1 at 81:1-8). According to Keith Mangan, Brian Bolus stated in a telephone conversation that

29

"he was not going to assist or cooperate in an appraisal process that in any way interrupted his business operations." (*Id.* at 81:3-5).

38. After this initial conversation between Mangan and Bolus, M&T Bank made no further attempts to appraise the equipment:

> And I guess I should add that I didn't move it [i.e., the appraisal process] beyond that, because this was just another in a series of e-mail exchanges or telephone conversations where Brian said he wouldn't agree to this, he wouldn't agree to that, or he was directing the bank to do this or directing the bank to do that. We were just at a point where he had adopted a position where it was essentially his way or no way.

(Hr'g Tr. vol. 1 at 81:17-24).

39. At the hearing, the parties did not present evidence regarding the total appraised value of Minuteman's real property or its equipment and other assets. When asked questions about the value of these assets, M&T Bank could not provide any estimated values. (Hr'g Tr. vol. 1 at 183:1, 184:19–185:21).

## The Proposed Receiver

40. M&T Bank proposes that Keith M. Northern serve as a receiver. Northern testified that his role would be to "go in, stabilize the company, and then prepare or determine the best course of getting a proper return going forward. In other words, is there a viable business there that could be sold or run or whatever, or are we just beyond that point." (Hr'g Tr. vol. 2 at 101:3-8).

41. Northern has extensive experience as a court-appointed receiver but has little to no familiarity with environmental regulatory agencies or the natural gas industry. (Hr'g Tr. vol. 1 at 107:8–108:8; Pl. Ex. 32).

30

42. Northern estimated that his services would cost about $25,000 per week during an initial 30-day period. (Hr'g Tr. vol. 2 at 135:10-13).

## C.    Conclusions of Law

After carefully reviewing the evidence in this case, the Court finds that a court-appointed receiver is not justified. Equity does not demand a receiver, nor do any of the loan documents show that the parties agreed to a receiver in the event of default.

### 1.    Equity does not Favor a Court-Appointed Receiver

M&T Bank has not shown that an emergency exists or that a receiver is necessary to protect M&T Bank's property interests. *See Comerica Bank v. State Petroleum Distributors, Inc.*, 3:08-CV-678, 2008 WL 2550553 (M.D. Pa. June 2, 2008). Since M&T filed the complaint in this matter, Minuteman has made several loan payments to M&T Bank. As of September 18, 2013, only one loan was past due—Term Loan 190—for $83,993.73. (Def. Ex. A). M&T Bank could make this loan payment current by applying the net proceeds it now holds from the helicopter sale. As of September 27, 2013, Minuteman also owed $1,145,445.28 on Line of Credit #34. Even so, M&T Bank has not demonstrated that an emergency exists simply because Minuteman is behind on certain loan payments.

M&T Bank also failed to show that a receiver is necessary to protect M&T Bank's collateral. The only significant asset that Minuteman has liquidated since the May 29, 2013 seizure is a helicopter. Both M&T Bank and the Commonwealth had previously approved this sale (Hr'g Tr. vol. 1 at 13:3-6, 56:5-12); M&T Bank received in excess of $2.5 million from the sale; and M&T Bank representatives acknowledged that Minuteman

31

did not sell the helicopter at a "fire sale price" (Hr'g Tr. vol. 1 at 144:19). Moreover, there is no evidence to suggest that Minuteman has been jeopardizing the value of M&T Bank's collateral or intentionally concealing assets.

The scales of equity also weigh against a receiver. As noted above, in determining whether to appoint a receiver, the following equitable factors are considered:

(1) the probability of the plaintiff's success in the action; (2) the possibility of irreparable injury to the plaintiff's interests in the property; (3) the inadequacy of the security to satisfy the debt; (4) the probability that fraudulent conduct has occurred or will occur to frustrate the plaintiff's claim; (5) the financial position of the debtor; (6) the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; (7) the inadequacy of available legal remedies; (8) the lack of a less drastic equitable remedy; and (9) the likelihood that appointing a receiver will do more harm than good.

*Comerica Bank*, 2008 WL 2550553 at \*4 (citations omitted). The financial position of Minuteman is the only factor weighing in favor of a receiver. Minuteman has readily acknowledged that the pending criminal investigation has harmed its business and that it now struggles financially to maintain operations. (ECF No. 24 at 5; Hr'g Tr. vol. 2 at 151:17; Pl. Ex. 16). Nevertheless, financial stress alone is an insufficient reason to justify the extraordinary remedy at issue here.

Notable factors weighing against a receiver include the adequacy of legal remedies, the absence of irreparable injury, and the strong likelihood that appointing a receiver would do more harm than good. The parties agree that M&T Bank is entitled to call its loans due and, if necessary, to foreclose on the Minuteman assets. (Hr'g Tr. vol. 1 at 9:12-19; ECF No. 24 at 3). M&T Bank thus possesses a viable legal remedy.

With respect to irreparable injury, M&T Bank made several unpersuasive claims. Specifically, M&T Bank states that it has been irreparably harmed by

32

the effect of the Commonwealth's search and seizure on Defendants' business operations, the transfer and concealing of M&T Bank's secured collateral, the failure of Defendants to properly react and manage their cash crisis, their inability to profitably operate and protect the interests of creditors . . . , and the general downward spiral of the business . . .

(ECF No. 22 at 3). As stated above, there is no evidence that Minuteman has been concealing M&T Bank's collateral assets. Moreover, all of M&T Bank's other claims indirectly state the same thing: there is concern that Minuteman cannot repay the loans. Not only is monetary harm insufficient to show irreparable injury, *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994), M&T Bank presented no evidence as to the value of Minuteman's assets. M&T Bank holds four mortgages on Minuteman properties; liens on vehicles; and a first priority secured interest in all assets of Minuteman Spill Response, Inc.[12] There is no evidence to show that these substantial collateral interests would not adequately cover any monetary loss to M&T Bank.

Finally counseling against a receiver in this case are the severe ramifications that would accompany this remedy. Minuteman provides highly specialized services, and the proposed receiver has no familiarity with this type of business. (Pl. Ex. 32). As well, a receiver's fees could exacerbate Minuteman's financial problems. Indeed, "[t]here is nothing . . . which affects a corporation with such serious consequences as does the appointment of a receiver; it is a severe, and may be termed an heroic, remedy, and the conditions that call it into action should be such as would, if persisted in, ordinarily be fatal to corporate life." *McDougal v. Huntingdon & Broad Top Mountain R.R. & Coal Co.*, 143 A. 574, 577 (Pa. 1928). The Court will **deny** appointing a receiver on equitable grounds.

---

[12] See Part III *supra* for a summary of the collateral interests on the Minuteman loans.

33

## 2. M&T Bank is not Contractually Entitled to a Receiver

The final matter this Court must consider is whether the parties expressly agreed to a receiver upon default. The mortgages documents in this case provide:

L. **Remedies**. Upon . . . an Event of Default . . .

\* \* \*

2. **Other Remedies**. The Bank shall have the right, at its election, to take any one or more of the following actions: . . . (v) *to obtain appointment of a receiver of the Mortgaged Property without the necessity of proving either inadequacy of the security or insolvency of the Mortgagor* or any other Obligor, and the Mortgagor and each such person waive such proof and consent to the appointing of such receiver; . . .

(Pl. Exs. 2I, 2P, 2Q, 2R, 2X at §§ L.2) (emphasis added). Although this language may show that the parties consented to a receiver upon default, M&T Bank is not seeking a receiver to manage or collect rents from the mortgaged properties. Instead, M&T Bank requests that the Court "[a]ppoint a Receiver to *take possession and control of Defendants and their assets and operations*; to determine the viability of the business operations and whether a sale of the businesses or entities is warranted and feasible; . . . " (Compl. at 18) (emphasis added). The mortgage documents apply solely to certain ancillary business entities: B3 Management, L.P., BPK Holdings, LLC, and Double B Realty. Because M&T Bank seeks a receiver to control the entire business operation—notably, Minuteman Spill Response, Inc. and Minuteman Towing, Inc.—the Court finds that the mortgage documents are inapposite to this case.

The second provision at issue involves the MSR/B3 Security Agreement and the BPK Security Agreement. These documents provide:

34

7.2. Rights and Remedies Upon Default. Upon the occurrence of any Event of Default, . . . [M&T Bank] . . . *may exercise all rights and remedies of a secured party under the UCC, under other applicable law, in equity or otherwise or available under in* [sic] *this Agreement including*:

\* \* \*

7.2.4 Collect Revenues. . . . [M&T Bank] *may either directly or through a receiver* (i) demand, collect and sue on any Collateral consisting of accounts or any other Collateral . . . (ii) file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate . . .; (iii) take control, in any manner, of any payment or proceeds from the Collateral; . . .

(Pl. Ex. 2L, 2T at §§ 7.2.4) (emphasis added). This language does not plainly evidence that the parties agreed to a receiver in the event of default. Instead, this language only contemplates that a receiver may be appointed and that, if a receiver is appointed, then the receiver would have the powers provided under the terms of the security agreement. Without clear, unambiguous language evidencing that the parties agreed to a receiver upon default, the Court will not appoint a receiver absent a prior showing that equity demands one. *See, e.g.*, *Comerica Bank*, 2008 WL 2550553 at \*4 (finding that a security agreement did not establish consent to a court-appointed receiver because the language did not clearly show "that the parties agreed to appoint a receiver in the event of a default").[13]

---

[13] Minuteman argues in its written brief in lieu of closing argument that this Court should use "its equitable powers" to award fees and costs associated with responding to the instant motion to appoint a receiver. (ECF No. 24 at 20). As support, Minuteman cites Federal Rule of Civil Procedure 11. "[T]he central purpose of Rule 11 is to deter baseless filings in district court and thus . . . streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). Sanctions are appropriate only in exceptional circumstances, such as when the "'claim or motion is patently unmeritorious or frivolous.'" *Dura Systems, Inc. v. Rothbury Invest., Ltd.*, 886 F.2d 551, 556 (3d Cir. 1989) (citations omitted). The Court will deny Minuteman's request for costs because there has been no abuse justifying the imposition of sanctions in this case.

## VI. CONCLUSION

The Court has carefully considered all of the parties' arguments. To the extent any issue was not specifically addressed above, it is either moot or without merit. For the reasons stated above, the Court will **deny** Defendants' motions in response to Plaintiff's complaint (ECF No. 8). The Court will also **deny** M&T Bank's emergency motion for appointment of a receiver (ECF No. 3).

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MANUFACTURERS AND TRADERS** | ) | |
| **TRUST COMPANY** | ) | |
| | ) | **CIVIL ACTION NO. 3:13-174** |
| **Plaintiff,** | ) | |
| **v.** | ) | **JUDGE KIM R. GIBSON** |
| | ) | |
| **MINUTEMAN SPILL RESPONSE,** | ) | |
| **INC., B3 MANAGEMENT, L.P.,** | ) | |
| **BPK HOLDINGS, LLC, EVEREST** | ) | |
| **AVIATION LLC, BPK CAPTIVE,** | ) | |
| **INC., DOUBLE B REALTY, and** | ) | |
| **MINUTEMAN TOWING, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

NOW, this 16th day of December 2013, this matter coming before the Court on

Plaintiff's emergency motion for appointment of a receiver (ECF No. 3) and Defendants'

motions in response to the complaint (ECF No. 8); upon consideration of the motions and

the parties' accompanying briefs; after a hearing held on September 19, 2013 and October

8, 2013; and for the reasons provided in the attached memorandum,

**IT IS HEREBY ORDERED** that Defendants' motions in response to the

complaint (ECF No. 8)—including the motion to change venue, the motion to dismiss for

failure to join a necessary party, and the motion dismiss for failure to state a claim—are

**DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's emergency motion for appointment

of a receiver (ECF No. 3) is **DENIED**.

It appearing that no further action of the Court is required at this time, the Clerk of

Court shall mark the above-captioned case **CLOSED.**

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**